MARIE K. BADDOUR, as Administratrix with the Will Annexed of RASCHID S. BADDOUR, Deceased, Appellant, *v.* CITY OF LONG BEACH, Respondent.

Argued May 26, 1938; decided November 29, 1938.

*Charles C. Clark* and *Winifred Sullivan* for appellant. The defendant had no power to adopt a zoning regulation which would deprive plaintiff of the right to use the property as a rooming or boarding house. (*Matter of McAneny* v. *Board of Estimate*, 232 N. Y. 377; *Coley* v. *Campbell*, 126 Misc. Rep. 869; *Matter of Barker* v. *Switzer*, 209 App. Div. 151; *City of Utica* v. *Hanna*, 202 App. Div. 610; *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365; *People* v. *Cohen*, 272 N. Y. 319; *Dowsey* v. *Village of Kensington*, 257 N. Y. 221; *People ex rel. Wineburgh* v. *Murphy*, 195 N. Y. 126; *Gallon* v. *Hussar*, 172 App. Div. 393.) The zoning regulation attempting to restrict plaintiff's property against use as a boarding or rooming house, being without authority of law, arbitrary, unreasonable and confiscatory, deprives plaintiff of her property without due process of law. (*Dowsey* v. *Village of Kensington*, 257 N. Y. 221; *People ex rel. Durham Realty Corporation* v. *La Fetra*, 230 N. Y. 429; *People ex rel. Wineburgh Adv. Co.* v. *Murphy*, 195 N. Y.

126; *Matter of Stubbe* v. *Adamson*, 220 N. Y. 459; *Matter of Jacobs*, 98 N. Y. 98; *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365; *Matter of Wulfsohn* v. *Burden*, 241 N. Y. 288; *People* v. *Dr. Scholl's Foot Comfort Shops, Inc.*, 277 N. Y. 151; *Liggett Co.* v. *Baldridge*, 278 U. S. 105; *Pratter* v. *Lascoff*, 261 N. Y. 509; *Maxwell* v. *Miami*, 87 Fla. 107; *Matter of Isenbarth* v. *Bartnett*, 206 App. Div. 546; 237 N. Y. 617; *Cordts* v. *Hutton Co.*, 146 Misc. Rep. 10; 241 App. Div. 648; 266 N. Y. 399; *City of Buffalo* v. *Kellner*, 90 Misc. Rep. 407.) The defendant's 1922 zoning ordinance was on its face illegal; the premises in question were, on the uncontradicted evidence, used as a boarding and rooming house prior to the adoption of the 1930 zoning ordinance, so that even if a zoning ordinance could prohibit such use the property had, prior to 1930, acquired a vested right which the Constitution protects. (*Matter of Kensington-Davis Corp.*, 239 N. Y. 54; *Harris* v. *Village of Dobbs Ferry*, 208 App. Div. 853; *City of Olean* v. *Conkling*, 157 Misc. Rep. 63; *Matter of Longley* v. *Rumsey*, 130 Misc. Rep. 492; *Matter of Barker* v. *Switzer*, 209 App. Div. 151; *Actlaw Realty Corp.* v. *Wilkus*, 220 App. Div. 720.)

*Bernard H. Reich, Corporation Counsel* (*Louis A. Friedman* of counsel), for respondent. The Council of the city of Long Beach was duly clothed with legislative authority to enact the ordinances. (*Village of Carthage* v. *Frederick*, 122 N. Y. 268; *Bacon* v. *Miller*, 247 N. Y. 311.) The zoning legislation of the city of Long Beach was a constitutional exercise of the police power. (*Biggs* v. *Steinway & Sons*, 229 N. Y. 320; *Lincoln Trust Co.* v. *Williams Building Corp.*, 229 N. Y. 313; *Matter of Wulfsohn* v. *Burden*, 241 N. Y. 288.) The zoning ordinances prohibit boarding or rooming houses in the district where appellant's property is located. (*Mischlich* v. *Lubin*, 182 App. Div. 703; *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365.) The plaintiff never acquired any

legal right to use her property as a rooming or boarding house, hence there never was a legally existing use at the time of the adoption of the zoning ordinances. (*Premium Bond Corp.* v. *City of Long Beach*, 249 App. Div. 756.) The zoning ordinances do not interfere with any property right of appellant. (*Dowsey* v. *Village of Kensington*, 257 N. Y. 221; *Perlmutter* v. *Greene*, 259 N. Y. 327; *Matter of Midstate Advertising Corp.* v. *Bond*, 274 N. Y. 82; *Matter of Danniels*, 74 Misc. Rep. 485; *Barnham* v. *City of Rochester*, 246 N. Y. 140.)

RIPPEY, J. Plaintiff asks for judgment in this action declaring that the zoning ordinances of the city of Long Beach do not prohibit the use of the premises at 116 Magnolia boulevard as a rooming and boarding house, but, if they do, that the ordinances are beyond the power of the city to enact and enforce. The expressly declared and ultimate purpose of the action is to restrain the city from interfering with the use of the premises in question for the purpose of operating thereon a rooming and boarding house *as a business.* We limit our decision, as we must, to the issue as framed and to the relief desired.

The territory now embraced within the city of Long Beach, a well-known and popular summer resort, was laid out in 1907 and developed by two real estate development corporations known as The Estates of Long Beach and West End Seashore Bungalows, Inc. It is recited in the zoning ordinance adopted by the city on August 18, 1922, to which later reference is made, that " a uniform scheme and plan of development and beautification of said properties was adopted and adhered to by said companies, with wide Boulevards running North and South from the Channel to the Ocean, in which said Boulevards parkings were provided for grass and flowers and shrubs, and uniform East and West Streets were laid out, with thoroughfares approximating a City block in width, similarly

parked and beautified," and that "said development companies in sales of lots and plots in said properties to individual purchasers restricted certain sections and streets and portions of streets to residential structures of high class and costly type and other sections and streets and portions of streets to residences of a less costly type and other sections and streets and portions of streets to business structures and uses." A boardwalk many miles in length was constructed along the ocean front. All apartments, hotels, places of amusement, boarding houses and business establishments of every nature were generally and principally limited to an area immediately adjacent to this boardwalk along Broadway and facing the ocean and to both sides of another street (Park avenue) several blocks to the north. The territory between the rear line of lots facing on Broadway and West Park avenue to the north was limited to highly restricted residential use. There single-unit one-family detached dwellings were constructed, each for one housekeeping unit only, ranging in cost from twelve thousand to twenty-five thousand dollars each.

The property in question is located within that highly restricted residential area. It was originally conveyed from the Estates of Long Beach to one Gillespie on July 28, 1908. The deed contained, among other restrictions relating to location, size, character and cost of buildings, a covenant binding upon the heirs and assigns of the grantee and similar in wording to similar covenants in all deeds to property within this area, reading as follows: "That neither the said party of the second part nor his heirs or assigns shall or will manufacture or sell or cause to be manufactured or sold on any portion of the premises hereby conveyed any goods or merchandise of any kind and will not carry on, or permit to be carried on, on any part of said premises any trade or business whatsoever or any boarding house." This covenant, it was provided, should run with the land until January 1, 1930,

although it might be annulled by agreement between the grantor and the grantee, his heirs or assigns, prior to that time.

On August 18, 1922, in accordance with chapter 635, section 74, subdivision 3, of the Laws of 1922, a zoning ordinance for the city of Long Beach was duly adopted. The ordinance recites that the original owners of the property embraced within the territory of the city had ceased to be the owners of any property within such territory and that the ordinance was adopted " to maintain the beauty and symmetry of development of business and residential properties within the City of Long Beach, and in order to protect the citizens of the City of Long Beach who have invested in substantial homes and in business properties on the faith of the maintenance and control over the restrictions hereinbefore referred to and the control of said development companies over the character and form of residential and business structures to be erected within the City and in order to protect the City of Long Beach and its inhabitants against the hazards of fire, and in order to provide for the health, comfort and welfare of the people of the City of Long Beach." It was an interim ordinance supplemental to the covenants contained in the deeds to the property and designed to effect compulsory obedience to the restrictive covenants in the grants from the original owners ordained to be in the interests of the health, safety and the general welfare, convenience and common good of the people and to make permanently effective the design and purpose with which the whole area of the city was laid out and developed. Restrictive covenants in grants as to use may be enforced (*Baumert* v. *Malkin*, 235 N. Y. 115; *Levy* v. *Schreyer*, 177 N. Y. 293). Ordinances to compel obedience to such covenants, when non-discriminatory and applicable to all alike within a given area, even though they involve incidental aesthetic considerations, may be adopted and enforced. (*Lincoln Trust Co.* v. *Williams Bldg. Corp.*,

229 N. Y. 313; *Matter of Wulfsohn* v. *Burden*, 241 N. Y. 288, 299–302.)

On July 8, 1930, the city adopted a permanent zoning ordinance in which was carried forward the substance of the provisions of the interim ordinance. The territory was divided, according to the ordinance and the zoning map attached, into nine residential districts, three business districts, and industrial districts. The property in question was located in " Residence A " district, which has the highest restrictions of all districts shown on the zoning map. The ordinance restricts the use of buildings in this district, so far as material here, to " a one-family detached house for one housekeeping unit only " with " accessory uses customarily incident to any use permitted by the provisions of this section," but such accessory uses referred to in the section had to do entirely with a garage located at the rear of the principal building. The building on the land in which plaintiff is interested was designed, used and occupied exclusively as a one-family private residence from the time of its construction to the time of the adoption of this ordinance. It never had been used for a boarding or rooming house. Plaintiff's use of the property is subject to any applicable restriction. Baddour acquired the property which is the subject-matter of this action on January 26, 1934. Whatever may be the form of conveyance by which he acquired title, it was acquired subject to the restrictions as to use contained in the Gillespie deed and carried forward in the interim and subsequent zoning ordinances adopted by the city. (*Lincoln Trust Co.* v. *Williams Bldg. Corp., supra.*)

Fundamentally, zoning ordinances arise out of and are sustained by considerations of the health and welfare of the community. On that basis we have sustained use regulations for the segregation in residential districts of detached, one-family houses from multi-family houses and dwellings (*Matter of Fox Meadow Estates, Inc.,* v.

*Culley,* 233 App. Div. 250; affd., 261 N. Y. 506) and of business from residential districts. If the zoning regulations are reasonable and substantially related to the health, safety, morals, the common good and general welfare of the community, they will be upheld (*Lincoln Trust Co.* v. *Williams Bldg. Corp., supra; Village of Euclid* v. *Ambler Realty Co.,* 272 U. S. 365), but the police power for the enactment of zoning regulations has been extended beyond strict considerations of health and safety (*Matter of Wulfsohn* v. *Burden,* 241 N. Y. 288) and " aesthetic considerations are, fortunately, not wholly without weight in a practical world " (*Dowsey* v. *Village of Kensington,* 257 N. Y. 221, 230). No question is here raised as to the regularity of the adoption of the zoning ordinances. The power to adopt them, within constitutional limitations, cannot be questioned (Gen. City Law [Cons. Laws, ch. 21], art. 2-A; Long Beach City Charter, art. 5, § 74 [Laws of 1922, ch. 635]; *Village of Carthage* v. *Frederick,* 122 N. Y. 268; *Bacon* v. *Miller,* 247 N. Y. 311). The city had power to restrict the use of the building on the property in question to a single housekeeping unit and to exclude therefrom any business use. The ordinance is applicable to the use of plaintiff's property. It is not unreasonable to prohibit its use as a boarding or rooming house as a business. There is nothing in the ordinance that specifically, in words, prohibits the use of the property for the keeping of roomers and boarders. But there is nothing vague or indefinite in its purpose or meaning. It prohibits the use of the property for business purposes. Construed in the light of its history, it excludes the use of the property for a boarding or rooming house. Provisions for the exclusion of business enterprises from residential zones are now generally found in zoning ordinances. If it be a fact that the limitation on the use of the property will make it more difficult for the plaintiff to sell or dispose of the same or otherwise entail hardship, it does not necessarily follow that the constitutionality

of the ordinance may be questioned. (*Matter of Wulfsohn* v. *Burden, supra.*)

The fact that the property may not be used for the business of keeping roomers and boarders does not bar the occupant from occasionally taking roomers or boarders, upon special considerations, where the practice is merely incidental and accessory to the principal use of the house as a home by the family of the occupant. The ordinance does not apply to accessory use by a private housekeeper " who might occasionally keep one or more boarders, but who did not make it a business," but rather to the principal use of the house as a boarding or rooming house, which is defined as " a sort of public house, partaking in some degree of the character of an inn, or restaurant, but differing from either, where the business of entertaining persons for certain periods, and at fixed or agreed prices, was carried on." (*Cady* v. *McDowell*, 1 Lans. [N. Y.] 484, 487.) More fully defining a boarding house, the court in the *Cady* case said (p. 486): " A boarding house is not in common parlance, or in legal meaning, every private house where one or more boarders are kept occasionally only, and upon special considerations. But it is a *quasi* public house, where boarders are generally and habitually kept, and which is held out and known, as a place of entertainment of that kind. * * * A boarding house is as well known, and as distinguishable from other houses, in every city and village in the country, as an inn or a tavern. It is a house where the business of keeping boarders generally is carried on, and which is held out, by the owner or keeper, as a place where boarders are kept." To like effect are *Commonwealth ex rel. Smith* v. *Cuncannon* (3 Brewst. [Pa.] 344); *Stewart* v. *McCready* (24 How. Pr. 62); *Robbins* v. *Bangor Ry. & Elec. Co.* (100 Me. 496); *Friedrich Music House* v. *Harris* (200 Mich. 421); and see Ballentine's Law Dictionary (p. 159) and Black's Law Dictionary (3d ed., p. 230).

In *Robbins* v. *Bangor Ry. & Elec. Co.* (*supra*) the court has collected the decisions as to the difference between a "family" house and a boarding house. Concluding, it said (at p. 506): "If the foregoing definitions gathered from the cases give a correct view of the various phases of a family relationship as applicable to this case, from the judicial point of view, as we think they do, it is clear that boarders do not constitute the family or a part of it. A family living together in a house as a home is none the less a family, because incidentally there are boarders in the same house, and perchance eating at the same table. But a boarding house is none the less a boarding house, when used as such, because the boarding house keeper and his wife and children live in it while the business of keeping a boarding house is being carried on. The *Laughton & Clergue* contract limited the rates for ' a dwelling house containing a family ' to annual flat rates for specified amounts. It contemplated as we think a dwelling house containing a family living together in domestic and social relations in the house as a home, and not a place of carrying on the business of keeping boarders. The test is whether the petitioner's tenant occupied the house as a home for himself and his wife and children, and incidentally kept boarders also, or whether he occupied it as a place for carrying on the business of keeping boarders, although while prosecuting the business, and as a means of prosecuting the business, he and his wife and children live in the house also. Under this test, neither the size of the house, nor the number of the boarders are of importance, except as evidence that may have weight in determining which is the principal use for which the building is occupied."

Using the dwelling as a rooming or boarding house within the above definitions is not a proper accessory use within the residential district and is prohibited by the ordinance.

A test of the constitutionality of the ordinance is not barred by the proceedings authorized by the zoning laws. Proceeding under the ordinances, plaintiff applied to the Zoning Board of Appeals of the City of Long Beach for a variation of the ordinance to permit her to operate a rooming and boarding house on the premises which, after due notice and hearing, was denied. By the express terms of section 81 of article 5-A of the General City Law, and of section 24 of the zoning ordinance, the Board of Appeals had jurisdiction to entertain and pass on the application and to grant the variance sought. Certiorari is the sole method of reviewing its decision (Gen. City Law, art. 5-A, §§ 81, 82; *Matter of Beckmann* v. *Talbot*, 278 N. Y. 146). Jurisdiction of the Board of Appeals is confined, however, to providing " a measure of flexibility in the application of a general rule imposed for the general welfare," leaving to the courts in other proceedings (such as an action for a declaratory judgment) a determination of the constitutionality of the ordinance (*Dowsey* v. *Village of Kensington, supra,* p. 227).

The constitutionality of the ordinances being sustained, resort need not be had to sustain the decisions of the lower courts to the ground that plaintiff had not complied with requirements preliminary to the operation of a boarding house. The Sanitary Code of the city of Long Beach provides that every boarding house must obtain a license and permit from the Board of Health and pay a fee therefor before it can operate, and it has been found, as a fact, that no license was applied for or obtained. The power to make and enforce such a requirement is confirmed by legislative grant. (Gen. City Law, § 20, subd. 13.) Additionally, such a requirement is clearly within the police powers of the city and is reasonable and necessary in the interest of public health, safety and the general public welfare. No boarding house should be permitted to operate until inspection has been made by the city

authorities and the building has been found to conform to the building code and has been found suitable and safe for the proposed use.

The judgment appealed from should be affirmed, with costs.

LOUGHRAN, J. (dissenting). The action is one for a declaratory judgment.

Among the assets of an estate represented by the plaintiff is a parcel of real property in the city of Long Beach. This property is located in a " Residence A District " as established by the zoning ordinance of the city. There stands upon it a detached building designed for occupancy by one family. The question is whether use of that structure as a boarding house or rooming house would violate a provision of the ordinance that " a one-family detached house " within a " Residence A District " can be used " for one housekeeping unit only."

This provision of the ordinance does not ban boarding houses or rooming houses as such. It does not attempt to limit the number of persons who may occupy " a one-family detached house." It does not attempt to confine membership in a " one housekeeping unit " upon any basis of relationship by blood or marriage or dependence. Nor does it say that such a unit may not be organized or managed for profit. The word " family " has a wide signification and may include boarders or lodgers. (See *Matter of Shedd*, 60 Hun, 367, 369; 133 N. Y. 601.) " One housekeeping unit " means a single household existing under one head. The circumstances that bring the members together can have no bearing on the meaning of the phrase.

It is thus clear enough to me that the ordinance does not proscribe the use of plaintiff's property as a boarding house or rooming house (though conducted as a business), provided the occupants use the house in common under a single domestic government. All valid regulations

respecting the prosecution of that sort of undertaking (and as to signs and the like) are, of course, to be obeyed.

The restriction that but one housekeeping unit shall occupy a one-family residence doubtless has an admissible relation to the public welfare. But the mere quality or composition of such units could not reasonably have been defined or limited by a requirement that members must be united by particular motives or relationships. Had this ordinance declared a discrimination of that kind, it would, in my opinion, have been constitutionally invalid.

The judgments should be reversed and judgment directed for the plaintiff in accordance with this opinion, with costs in this court and in the Appellate Division.

O'BRIEN, HUBBS and FINCH, JJ., concur with RIPPEY, J.; LOUGHRAN, J., dissents in opinion in which CRANE, Ch. J., and LEHMAN, J., concur.

Judgment affirmed. (See 279 N. Y. 794.)